_____

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br>vs.<br><br>ARTURO MAGANA CHAVEZ,<br><br>                    Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**<br><br><br>Case No. 2:11-CR-384 DN<br><br>District Judge David Nuffer |

Defendant Arturo Chavez has moved to suppress statements and evidence discovered as a result of officers' entry to the backyard of 154 Westwood Avenue.  The government argues that this entry was proper under *Payton v. New York*[1] and *United States v. Gay*.[2]  However, because (a) officers lacked a reasonable belief that Mr. Chavez lived at that address and (b) officers lacked a reasonable belief that Mr. Chavez was present in the home at that time, the entry into the backyard was not justified. Mr. Chavez's motion to suppress[3] is GRANTED.

### Procedural History

On May 4, 2011, a federal grand jury returned an Indictment against Arturo Magana Chavez for violating 18 U.S.C. § 922(g)(1) Felon in Possession of a Firearm.[4]  On August 24, 2012, Chavez filed a motion to suppress evidence.[5]  On September 26, 2012, an evidentiary

_____

[1] 445 U.S. 573 (1980).

[2] 240 F.3d 1222 (10th Cir. 2001).

[3] Doc. 49, filed August 24, 2012.

[4] Court Docket (hereinafter "Ct. Doc.") 10.

[5] Doc. 49.

hearing was held on the motion.[6]  On October 27, 2012, Chavez filed his memorandum in support of suppression.[7]  On November 16, 2012, the United States filed its response.[8]  On December 13, 2012, Chavez filed his reply.[9]  On January 16, 2013, the Court heard oral argument on the motion.[10]  The parties exchanged drafts of the proposed order and submitted them to the court on March 18, 2013.

## FINDINGS OF FACT

In the late afternoon or early evening of April 27, 2011, Officer Brett Miller of the Taylorsville, Utah, Police Department met with a confidential informant who provided information about Arturo Chavez, the defendant in this case.[11]  The informant claimed to be "very familiar" with Mr. Chavez, including the fact that Mr. Chavez was a fugitive.[12]  The informant told Officer Miller that Mr. Chavez went by the gang-name "Wizard" and was a member of the "Diamond Street" gang.[13] He also told Officer Miller that prior to April 27, 2011 law enforcement officials had attempted to serve an arrest warrant on Mr. Chavez at Mr. Chavez's mother's residence, but the record is silent about why they were unable to find him there—whether he was previously living there but moved or was just simply not there at the time.[14]

The informant also claimed to have information about Mr. Chavez's living situation.  He

---

[6] Doc. 56.

[7] Doc. 58.

[8] Doc. 59.

[9] Doc. 61.

[10] Docs. 67, 68.

[11] Doc. 57, Suppression Hearing Transcript dated September 26, 2012 at 12, 28, 37 (hereinafter "Tr.").

[12] Tr. 12-13.

[13] Tr. 12-13.

[14] Tr. 13, 37.

told Officer Miller that Mr. Chavez had been living in a vacant home located at 154 West Westwood Avenue ("Westwood home") in Salt Lake City, Utah, for about a month.[15] He informed Officer Miller the home was for sale by one of Mr. Chavez's family members and described the home as a small home on the north side of the road with a "For Sale" sign in the front yard.[16]  He said the home was vacant because it did not have running water.[17]  Finally, the informant claimed that Mr. Chavez had been distributing narcotics out of the Westwood home and warned that Mr. Chavez was always armed with a handgun, even when he answered the door.[18]

Later that same evening, Officer Miller verified the existence of a fugitive named Arturo Chavez.  He ran checks through the police database, confirmed that Mr. Chavez had an outstanding felony arrest warrant issued 8 months previous, and looked at his jail booking photograph.[19]  A listing of Mr. Chavez's scars, marks, and tattoos revealed his tattoos "Wizard" and "DST," consistent with Mr. Chavez's gang name Wizard and Diamond Street affiliation the informant had reported.[20]

Officer Miller did not further verify the information provided about Mr. Chavez's residence.  He made no effort to assess what other law enforcement officers had done to apprehend Mr. Chavez, why officers looked for him at his mother's home, or why they had not found him there.[21]  He did not go to Mr. Chavez's mother's home to ask about his

---

[15] Tr. 13.

[16] Tr. 13.

[17] Tr. 14.

[18] Tr. 14.

[19] Tr. 14.

[20] Tr. 14.

[21] Tr. 13, 15, 37–38.

whereabouts.[22]  Although the arrest warrant listed an address of 1525 West 500 North,[23] Officer

Miller did not go to that house.[24]  Nor did he realize that the address listed on the warrant was

not the home of Mr. Chavez's mother.[25]  Officer Miller made no efforts to determine who

actually owned the Westwood home or whether that person was a relative of Chavez.[26]

      The same night Officer Miller spoke with the informant, Officer Miller drove to the

Westwood home shortly after midnight.[27]  Westwood Ave. is a dead-end street that travels west

from West Temple St. at about 2000 South and ends with a circle.[28]  Officer Miller drove past

the Westwood home and said he recognized it by the "For Sale" sign in the front yard.[29] The

lights in the home were off and there was a car parked in the driveway alongside of the home,

with the back towards the home and the front facing the street.[30]  Officer Miller turned around at

the end of the street to go back out towards West Temple.[31]  Officer Miller then saw another

vehicle arrive at the home and back into the driveway.[32]  As he passed the house again, he did

not see the driver, although the driver's door was now left open, but he did see a female

passenger getting out of the car.[33]  It appeared that whoever had operated the vehicle had

---

[22] Tr. 37–38.

[23] Gov't Ex 1.

[24] *See* Tr. 37, 59; Gov't Ex. 1.

[25] Tr. 37–38.

[26] Tr. 39.

[27] Tr. 16.

[28] Tr. 16.

[29] Tr. 16.

[30] This fact was not clarified in the hearing but in later discussions between the United States Attorney and Defense Counsel, docket no. 72, lodged May 2, 2013.

[31] Tr. 16.

[32] Tr. 16-17; Gov't Ex. 2b at 4.

[33] Tr. 17–18. The female was later identified as Jennifer Crew. (Tr. 53.)

immediately exited and was out of Officer Miller's view.[34]  The female passenger was unknown at the time but later identified as Jennifer Crew.[35]

Officer Miller ran the license plate and learned the car was registered to Jenny Lopez at 154 West Westwood Avenue.[36] Officer Miller conducted a history check on Ms. Lopez and found she had "documentation" with a person named Christopher Gonzales.[37]  Officer Miller did not explain what documentation he saw or how Ms. Lopez was connected to Mr. Gonzales.  He did, however, determine that at some point, Mr. Gonzales had previously been a resident of that house and was related to Mr. Chavez.[38]  Additionally, Officer Miller was also able to confirm that Christopher Gonzalez is Chavez's relative.[39]

Despite Officer Miller's apparent belief that his inquiry adequately verified the informant's claim that this home belonged to a relative of Mr. Chavez, Officer Miller, in fact, did not verify either who owned the home or whether the owner was related to Mr. Chavez.  Those facts would have been consistent with the informant's statements.  He only knew that a prior *resident* of the home was related to Mr. Chavez, and that the registered *owner of the car* that appeared had "documentation" with Mr. Chavez.  These facts were unrelated to the informant's statements.  Officer Miller admitted that none of the information he had learned that day gave him reason to believe Mr. Chavez was in the house at that time.[40]

---

[34] Tr. at 17-18.

[35] Tr. at 53.

[36] Tr. 19.

[37] Tr. 20.

[38] Tr. 43.

[39] Tr. at 20, 43.

[40] Tr. 43.

Officer Miller assembled members of the Joint Criminal Apprehension Team (hereinafter "JCAT").[41] At approximately 12:30 a.m., JCAT was briefed on Mr. Chavez, the Westwood home, and other officer safety concerns.[42] Pursuant to its policy, JCAT set up a containment area around the Westwood home.[43] Some officers who were to contact Mr. Chavez went to the front door, while other officers went to the rear of the Westwood home.[44]  One of these was Detective Levi Hughes.

For his part in establishing containment at the rear of the home, Detective Hughes passed through an open gate in a fence that enclosed the backyard and positioned himself on the back porch next to a sliding glass door that was completely covered with a blind except for a five-by-five inch gap towards the bottom.[45] While other officers knocked at the front door, Detective Hughes crouched down and peered into the home through the gap in the blinds.[46]  Through the gap, Detective Hughes saw a woman walk through the house, and he saw Mr. Chavez crawl on the floor and get a handgun from under the couch.[47]  Detective Hughes then watched Chavez "[g]rab it, snap it, put a magazine in it, [and] rack it to chamber [] a [round]."[48]

Detective Hughes radioed to other JCAT officers that he saw Mr. Chavez arm himself with a gun.[49] In response, JCAT expanded their containment for the officers' safety and moved

---

[41] Tr. 20.

[42] Tr. 20–21.

[43] Tr. 21.

[44] Tr. 22.

[45] Tr. 36-37.

[46] Tr. 22, 63.

[47] Tr. 23, 66-67.

[48] Tr. 67.

[49] Tr. 44, 67.

police vehicles in front of the home to be used as cover.[50] During this time, JCAT officers continued to command Mr. Chavez to surrender.[51]

Because Mr. Chavez refused to answer the door, and because officers knew he was armed, JCAT began employing other tactics to secure his arrest.  They breached the Westwood home's front door with a ram so they could visually determine Mr. Chavez's location in the house and introduce a canine if necessary.[52] JCAT officers next broke windows and introduced pepper balls into the Westwood home so they could see more clearly into the home.[53]

Around 2:30 a.m., the Salt Lake City Police Department (SLPD) SWAT Team was called to introduce tear gas into the Westwood home.[54] Officer Miller had a conversation with SLPD Lieutenant David Cracroft.[55] After being fully briefed on the relevant facts, Lieutenant Cracroft was unwilling to introduce tear gas without a warrant because he did not believe Officer Miller had enough information to believe that Mr. Chavez resided in the home.[56]

Officer Miller requested a search warrant from the Third Judicial District Court to search the Westwood home, arrest Mr. Chavez, and search for a firearm.[57] The request was authorized an hour and a half later.[58]

---

[50] Tr. 23–24.

[51] Tr. 24, 69.

[52] Tr. 24.

[53] Tr. 25, 26, 45-46.

[54] Tr. 46.

[55] Tr. 49, 89.

[56] Tr. 83, 85–87, 93–94, 96.

[57] Tr. 26; Gov't Ex. 2a & 2b.

[58] Tr. 27, 52; Gov't Ex. 2a.

Once the search warrant was obtained, the SLPD Swat Team deployed tear gas into the Westwood home.[59]  Ms. Crew exited the Westwood home shortly after the tear gas was introduced.[60] Ms. Crew told JCAT Officers that Mr. Chavez was inside and was armed with a gun.[61]  Between 6:00 a.m. and 7:00 a.m., Mr. Chavez surrendered and was arrested outside of the Westwood home.[62] Following Mr. Chavez's arrest, officers entered the home pursuant to the search warrant and located a firearm.

## CONCLUSIONS OF LAW

**I.      Mr. Chavez has standing to challenge the search of the Westwood home.**

Although none of the officers had this information before Mr. Chavez's arrest, the record now establishes that 154 Westwood Ave. was owned by Jennifer Lopez and that she had given Mr. Chavez "permission to be at the home and sleep there when needed."[63]  Accordingly, the Court finds that Mr. Chavez was an invited overnight guest and, as such has standing to challenge the search of this house. "An individual does not have to be 'settled' at a location to have a reasonable expectation of privacy; a simple overnight guest has Fourth Amendment standing."[64]

**II.     Officers entered the curtilage without a search warrant.**

When officers entered the backyard, they entered the curtilage of the home, an area protected by the Fourth Amendment.[65] Because Detective Hughes did not have a search warrant

---

[59] Tr. 48, 53.

[60] Tr. 53, 56.

[61] Tr. 53.

[62] Tr. 53–54.

[63] Tr. 111.

[64] *United States v. Poe*, 556 F.3d 1113 (10th Cir. 2009) (citing *Minnesota v. Olsen*, 495 U.S. 91, 96–97 (1990)).

[65] *See Lundstrom v. Romero*, 616 F.3d 1108, 1128 (10th Cir. 2010) (noting that the Tenth Circuit has had "little trouble finding that [an individual's] backyard qualified as curtilage"); *United States v. Carter*, 360 F.3d 1235, 1241

when he entered the backyard, went to the back porch, and peered through a small opening at the bottom of a covered glass door, the fruits of that search must be suppressed unless the government can establish that the intrusion into the home was reasonable under some other exception to the warrant requirement.

"For a search without a warrant to be valid, it must fall within a recognized exception to the warrant requirement; searches within the home without a warrant 'are presumptively unreasonable.'"[66]  "[T]he government bears the burden of proving that [an] exception to the warrant requirement applies, a burden which is 'especially heavy when the exception must justify the warrantless entry of a home.'"[67]

The government seeks to proceed under the exception to the search warrant requirement articulated in *Payton v. New York*: "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."[68]  The government is correct that *Payton* authority to enter a *house* where the defendant resides also includes the authority to enter the *curtilage*.[69]  However, this doctrine still depends on the defendant's actual residence in the Westwood home.

In *United States v. Gay*, the Tenth Circuit applied *Payton* after "a two-prong test: officers must have a reasonable belief the arrestee (1) lived in the residence, and (2) is within the

---

(10th Cir. 2004) (noting government's concession "that the backyard should likewise be treated as a home because it is within the curtilage of the residence"); *see also United States v. Morehead*, 959 F.2d 1489, 1496 (10th Cir. 1992) ("The curtilage of a house is protected under the Fourth Amendment."); Doc. 59 at 22 (conceding that Officer Hughes entered the curtilage).

[66] *Kerns v. Bader*, 663 F.3d 1173, 1192 (10th Cir. 2011) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)).

[67] *Id.* (quoting *United States v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006)).

[68] 445 U.S. 573, 603 (1980) (emphasis added); *United States v. Gay*, 240 F.3d 1222, 1226 (2001) ("[A]n officer has limited authority based on the arrest warrant to enter a dwelling where the suspect resides.").

[69] *Morehead*, 959 F.2d at 1496.

residence at the time of entry."[70]  Under this analysis, "the court must look at all of the

circumstances present in the case to determine whether the officers entering the residence had a

reasonable belief that the suspect resided there and would be found within."[71]  Looking at the

totality of evidence known at the time of Detective Hughes's entry, the government cannot meet

its burden on either prong.[72]

### III.    Officer Miller did not have a reasonable belief that Mr. Chavez lived at 154 Westwood Ave. when officers entered the backyard.

As to the first prong of the *Gay* test, Officer Miller could not reasonably believe that Mr.

Chavez lived in the Westwood home. The only evidence that Mr. Chavez lived in the home was

the informant's assertion of that fact, but it was unreasonable for Officer Miller to rely on this

assertion for several reasons.

First, the assertion itself was ambiguous and inconsistent.  Although the informant

claimed Mr. Chavez resided at the Westwood home, he also told Officer Miller that the home did

not belong to Mr. Chavez and that it was generally vacant because it lacked running water.  The

informant also told Officer Miller that other officers had looked for Chavez at his mother's

home, suggesting that Mr. Chavez, in fact, might be living elsewhere.  The possibility Chavez

lived elsewhere was increased by the August 27, 2010, arrest warrant, which listed Chavez's last

known address as 1525 West 500 South, Salt Lake City, Utah.[73]  In light of the inconsistent

information provided by the informant, Officer Miller could not reasonably rely on the

informant's assertion alone to believe that Mr. Chavez lived at the Westwood home.  When it

came to the central question—Mr. Chavez's residency—the inconsistent details the informant

---

[70] 240 F.3d at 1226.

[71] *Valdez v. McPheters*, 172 F.3d 1220, 1226 (10th Cir. 1999).

[72] *See id.* at 1226.

[73] Gov't Ex. 1 at 2.

provided were an inadequate basis for Officer Miller to reasonably believe that Mr. Chavez was living in the Westwood home.

Despite Officer Miller's efforts to verify the informant's statements about Mr. Chavez's *identity*, the Court finds that Officer Miller did not sufficiently resolve the inconsistent information about Mr. Chavez's *residency* before entering the curtilage of the Westwood home. It is true that he confirmed the existence of Mr. Chavez and his fugitive status and that he verified the existence of the home in question. But Officer Miller did not clarify the ambiguous and inconsistent information about Mr. Chavez's residency. Officer Miller did not inquire whether Mr. Chavez was residing at 1525 West 500 North (the home listed on the arrest warrant), where Chavez's mother resided and if he was living with her, or if other law enforcement officers had, in fact, tried to locate Chavez at his mother's residence.

Moreover, despite his impression that he had verified that the home belonged to a relative, Officer Miller did not determine the current ownership of the Westwood home and whether that person was related to Mr. Chavez. Officer Miller's subjective conclusion that the home belonged to a relative was based only on the fact that the car that arrived at the house was registered to Ms. Lopez at this Westwood home address and that Ms. Lopez had "some documentation," not described in the evidence, with Christopher Gonzales, who was related to Arturo Chavez. That does not confirm the informant's statement. Nor does the fact that Mr. Chavez's relative Christopher Gonzales *lived* at the home at some point in the past confirm that the home was *owned* by a relative. The government has not established the familial link between Mr. Chavez and the homeowner that Office Miller thought he had found.

The limited information about the informant's identity also undermines the reliability of his information. The record does not indicate whether Officer Miller knew the informant,

whether he had been an informant on other cases, or any other information that might support Officer Miller's decision to rely on the informant's word alone about Mr. Chavez's residence. The record also does not indicate how the informant knew the facts he alleged, and whether he knew them from personal knowledge or from another source.  No evidence supports the government argument that the informant "remained accountable to Officer Miller if his tip was fabricated."[74]  There is no evidence about the informant's reliability or the circumstances of the discussion.

In the end, the informant's claim that Mr. Chavez was living at this house was unverified and ambiguous.  This case stands in contrast to *United States v. Gay* and *United States v. McPheters*, in which the officers' reasonable belief about the defendant's residence was reached after ongoing investigation and cumulative evidence that supported their beliefs about the individual's residence.  This case is factually similar to *United States v. Werra*, in which officers relied on an informant's inadequate claims of residency but "neither conducted surveillance nor took any other steps to verify" that the person named in the arrest warrant actually resided in the home they entered.[75]  The ambiguous and inconsistent information provided by the informant in this case, as in *Werra*, did not support a reasonable belief that Mr. Chavez resided in the Westwood home.  No further investigation was conducted which might have corroborated the informant's statements.

**IV.    Officer Miller did not have a reasonable belief that Mr. Chavez was within the residence at the time Detective Hughes entered the backyard.**

The government also fails to establish the second prong of a *Gay* analysis because Officer Miller did not have a reasonable belief that Mr. Chavez was present when Detective Hughes

---

[74] Doc. 59 at 13.

[75] *United States v. Werra*, 638 F.3d 326, 337 (1st Cir. 2011).

entered the backyard of the Westwood home.  Because Officer Miller knew the house was generally vacant, he could not reasonably conclude that a car in the driveway, a dark house and the midnight hour meant that Mr. Chavez was in the home asleep.  Although Officer Miller saw someone arrive at the home, he did not know see who it was, so he could not reasonably conclude it was Mr. Chavez.  To the contrary, because he knew the car was registered to Ms. Lopez at that address, the most reasonable inference was that Ms. Lopez had come to her vacant house, not that Mr. Chavez had been driving her car.  While the arrival of the car and the lights on in the house established that someone was in the house, even Officer Miller agreed that "none of this information told [him] that Arturo Chavez was in the house."[76]  Accordingly, the Court finds that Officer Miller had no factual basis to believe that Mr. Chavez was present when he sent officers to the back yard to contain the house.  To the extent Officer Miller actually believed Mr. Chavez was in the home, this belief was unreasonable.

## V.    The fruits of the unlawful entry must be suppressed.

Because Officer Miller did not reasonably believe that Mr. Chavez was a resident of the Westwood home or that he was present when Detective Hughes went to the backyard, the fruits of Detective Hughes's observation of activities inside the home from within the curtilage must be suppressed.

To suppress evidence, the defendant must show "a factual nexus between the illegality and the challenged evidence."[77]  Applying that standard here, Detective Hughes's observations through the ground-level gap in the blinds, from the back porch, after entering the fenced rear yard, (that Mr. Chavez had the gun in his hand) and the gun itself should be suppressed.  Another

[76] Tr. 43.

[77] *United States v. Jarvi*, 537 F.3d 1256, 1260 (10th Cir. 2008).

result of Detective Hughes's observation was the decision to introduce pepper balls and tear gas into the home.  As a result of these chemicals being introduced into the house, Jennifer Crew left the home and made incriminating statements to the police.  Those statements should also be suppressed.

The government argues that the discovery of the gun was inevitable because officers later obtained a search warrant to enter the house to look for the gun.[78]  However, the process of seeking a warrant had not even begun when Detective Hughes entered the backyard.  Indeed, for the same reasons as discussed above, officers did not have probable cause at that time to believe that either Mr. Chavez or a firearm would be found in the home.  The decision to seek a warrant that included the gun was a result of Detective Hughes's observations from the back porch.  Accordingly, the government fails to establish that discovery of the gun was inevitable.

## CONCLUSION

Because Officer Miller could not reasonably believe that (a) Mr. Chavez resided at that address and (b) was present at that time, the arrest warrant for Arturo Chavez did not authorize police to enter the Westwood home. Accordingly, the Court GRANTS Mr. Chavez's Motion to Suppress evidence.[79]

Dated May 2, 2013.

BY THE COURT:

_____
David Nuffer
United States District Judge

---

[78] Doc. 59 at 26.
[79] Doc. 49, filed August 24, 2012.